UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHARLES VAINISI,

     Plaintiff,

vs.

CINCINNATI METROPOLITAN
HOUSING AUTHORITY,

     Defendant.

Case No. 1:07-cv-104

Magistrate Judge Timothy S. Black

**MEMORANDUM OPINION AND
ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This civil action is before the Court on Defendant's motion for summary judgment

(Doc. 25) and the parties' responsive memoranda (Docs. 45, 47.) The parties have

consented to disposition by the United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(C). (*See* Doc. 9.)

## I. THE CLAIMS

Plaintiff, Charles Vainisi, filed a complaint against his former employer, the

Cincinnati Metropolitan Housing Authority ("CMHA"), on February 8, 2007. Vainisi

alleges that CMHA violated his rights under the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2615, *et. seq*.; O.R.C. § 4112, when it allegedly failed to grant his

requests for FMLA leave in a timely manner and disciplined him for failing to report for

work during his FMLA leave. Vainisi also alleges that CMHA discriminated against him

on the basis of age and disability, in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12102, *et. seq*., and the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621, *et. seq*.

## II. UNDISPUTED, MATERIAL FACTS

### A. Background

Plaintiff, Charles Vainisi, was employed by CMHA as a Senior Maintenance Worker from 1986, until his retirement in 2006. He was assigned to the maintenance location known as General Services North II, primarily serving CMHA properties in Millvale, English Woods and Webman Court.

CMHA employs a staff of maintenance employees who work regular hours of 8:00 a.m. to 4:40 p.m., Monday through Friday. In addition to regular hours, the maintenance staff is subject to "call backs" requiring that specific designated employees respond to urgent or emergency needs arising after regular hours. Maintenance workers are expected to respond to "call backs" when requested to do so by the supervisor.

In 1991, Plaintiff's wife died. During the illness preceding her death, Plaintiff's then supervisor did not assign "call back" duty to Plaintiff. Following his wife's death, Plaintiff continued avoiding "call back" duty as much as possible because responding to "call backs" on short notice created difficulties in accommodating the care of his children.

By 2002, CMHA's maintenance staff unionized, and the Collective Bargaining Agreement ("CBA") created formal requirements for the assignment of "call backs." After the CBA required that Plaintiff be assigned a place in the "call back" rotation, Plaintiff continued avoiding the duty by finding other employees willing to substitute for

him, as permitted under the CBA. Eventually, however, the number of employees in his department dwindled, and fewer employees were willing to take his place. As a result, in 2004, Plaintiff began covering his own "call backs" when it was his time in the rotation. By that time, Plaintiff's three children had turned 21, 19 and 16 years old.

Plaintiff did not like to work "call backs" because it "forc[ed] me to leave my family during times outside of those times which were my 40 hours." Plaintiff made his position well-known to his CMHA supervisors, including Claude Davis, Chuck Williamson and Joe Norton, in 2004.

## B. Plaintiff's Work History

During 2004, Plaintiff increased the number of work orders he passed along to other departments instead of addressing them himself. His supervisor, Claude Davis, felt Plaintiff should have passed along fewer work orders and encouraged Plaintiff to take more personal responsibility in that regard. Plaintiff, however, believed Davis remarks were critical, and the remarks became a source of conflict between them.

On September 15, 2004, Davis confronted Plaintiff about leaving the premises without approval after having clocked into work for the day. Plaintiff started shouting at Davis and refused to leave Davis' office.

On December 20, 2004, while Davis led a meeting of Plaintiff's crew, the subject of call back rotation came up. Plaintiff began shouting that he would not accept "call back" assignments. Davis interrupted Plaintiff, and Plaintiff then began to complain

-3-

about other employees' job performances, a topic not germane to the meeting, and cursed in the course of doing so. As a result of this incident, Davis later counseled Plaintiff that he was not permitted to engage in angry outbursts during staff meetings. Plaintiff was not otherwise disciplined for that incident.

On January 26, 2005, Plaintiff received a work order to retrieve a new garbage can for a unit being prepared for occupancy. Plaintiff found a previously used garbage can and placed it in the unit without cleaning it. A few minutes later, Bill Arnold, the supervisor of the crew responsible for preparing units for occupancy, found the dirty garbage can and paged Plaintiff. When Plaintiff responded, Arnold confronted him about the condition of the garbage can, and Plaintiff questioned Arnold's authority to do so. According to Plaintiff:

> So I called up [Arnold], and he said, "I want you to come up here right now and get this"-- he said, "You put a totally unsuitable garbage can up here." He said, "I want you to clean it out right now." And I'm like, "Whoa. Who are you?" And I said, you know, "Normally I'd think that you'd have to go through the chain of command. You should instruct my supervisor to tell me to do that rather than" -- And then he said, "Well, if I was your boss, I'd write you up right now." And I'm like, "Okay. Why don't we get together with my supervisor and just see what he thinks about the chain of command."

After the exchange with Arnold, Plaintiff retrieved the can and cleaned it.

Arnold arranged the meeting suggested by Plaintiff for the following morning, January 27, 2005. One of the supervisors told Plaintiff that the purpose of the meeting

-4-

was "because [he] had trouble with authority," and another supervisor questioned his job performance. Plaintiff became upset that Davis did not defend him in his assessment of the chain of command.

The meeting concluded when Davis left to attend to another commitment. As everyone else left, Plaintiff told Norton he was "sick" and abruptly left work for the rest of the day. When Davis discovered Plaintiff had left the premises, he reprimanded Plaintiff for unauthorized absence and expressed concern about the manner in which Plaintiff conducted himself at the meeting.

That night, Plaintiff was the employee designated for "call backs." Shortly after midnight on January 28, 2005, the on-call supervisor, Ralph Durham called Plaintiff and requested that he respond to a unit in CMHA's Millvale development that was without heat. Plaintiff refused, telling Durham he was ill. Although the CBA required that "call back" employees notify the on-call supervisor as soon as they encountered emergencies rendering them unavailable for future "call backs," Plaintiff had not done so before Durham's call. In addition, Plaintiff did not report for his regular shift on January 28, 2005, and never called CMHA to report his absence.

Having been informed by Durham that Plaintiff refused a "call back" assignment, and having observed that Plaintiff had not called to report his absence on January 28, Davis reprimanded Plaintiff for those transgressions.

Plaintiff's next period of call back responsibility began at 4:40 p.m. on February 24, and ended at 8 a.m. on March 4, 2005. Plaintiff asked other employees to cover his

duties for that week, but was unsuccessful in finding an available substitute. At approximately 6:30 p.m. on March 1, the on-call supervisor, Robert Boyd, made two separate calls to Plaintiff about a water leak and flooding emergency in a Millvale unit. During both conversations, Plaintiff insisted that "[he] was familiar with the apartment, that [he] had the work order, that [he] knew exactly what needed to be done, that it was not an emergency" and that "it could wait until tomorrow." Ultimately, because Plaintiff refused to respond to, Boyd had to assign it to another employee.

During that same period of call back duty, on March 3 at 4:20 a.m., Boyd contacted Plaintiff to secure the front door of a unit after a fire. Plaintiff refused to respond, saying he needed to take his 17-year-old son to school. He did not say there was any special reason why his son could not get to school on his own.

As a result of Plaintiff's refusal to respond to call backs on March 1 and March 3, Boyd requested a disciplinary hearing, which took place on June 29, 2005. Following the presentation of arguments by both management and the union at his hearing, Plaintiff was suspended for two days.

### C. FMLA Leave Requests Related to Son's Knee Surgery–July 2005

The first time Plaintiff ever applied for FMLA leave was in June-July 2005.

On June 21, 2005, Plaintiff approached Davis to apply retroactively for paid sick leave in connection with a doctor's appointment his son, A.V., had the previous day, June 20, 2005. Plaintiff also presented a doctor's note evidencing the appointment. At that

-6-

time, Plaintiff told Davis that A.V. needed knee surgery and that he would submit the necessary paperwork to have the time covered as leave under FMLA. Davis approved Plaintiff's retroactive request for sick leave to cover the June 20 appointment.

On July 1, Plaintiff submitted a request for paid sick leave to be with his son at the hospital on July 5 while A.V. underwent surgery. Davis approved that request. On July 11, Plaintiff applied retroactively for paid sick leave to care for A.V. from July 5 through July 8 following the surgery. Davis approved that request. Though Plaintiff had not formally applied for FMLA Leave in connection with A.V.'s surgery, his July 11 application for sick leave was construed by CMHA as one for FMLA Leave, and CMHA asked for certification of A.V.'s condition from A.V.'s healthcare provider.

On July 14, Plaintiff completed an FMLA Request Form seeking to have his sick leave from July 5 through July 12 retroactively designated as FMLA Leave. In addition, he sought intermittent FMLA Leave for the next four to five months in order to transport A.V. to physical therapy appointments. On August 12, CMHA approved Plaintiff's application for intermittent leave, but advised him that it would need recertification of A.V.'s condition by October 5, which would have been four months since the surgery.

Plaintiff did not seek any extension of his FMLA Leave for A.V.'s knee condition past October 5, even though A.V.'s last appointment for his knee condition occurred on November 14, outside of the approved FMLA period. Plaintiff submitted a request for paid sick leave between 11 a.m. and 4:40 p.m. on November 14, in order to ensure that A.V. made that appointment. That request was approved.

-7-

### D. FMLA Leave Requests for son's drug addiction treatment–November 2005.

A.V. also developed an addiction to drugs. On Friday, November 4, 2005, Plaintiff admitted A.V. to the psychiatric unit at Children s Hospital, and A.V. remained there until Tuesday, November 8. Plaintiff did not work on November 7 or 8. When he returned to work on November 8, he applied retroactively for paid sick leave to cover the time he remained off during A.V.'s hospitalization. The only information he provided CMHA was "son at Children s Hospital and dentist." His request for paid sick leave was approved.

On November 11, Plaintiff completed an FMLA Request Form seeking leave as needed in connection with A.V.'s outpatient drug treatment program. The healthcare provider's Certification indicated that Plaintiff would need to be absent from work intermittently for a four-week period beginning November 14, and ending December 12, in order to: provide transportation for A.V. to and from a daily treatment; participate in family sessions once per week for approximately one hour; and participate in a parents program on Thursdays between 6:30 and 9:30 p.m. In addition, the Certification indicated Plaintiff would have to be absent from work intermittently for the 12 weeks following December 12, in order to provide transportation for A.V. to attend 90 minute sessions on Wednesday evenings.

CMHA's office was closed to observe Veterans Day on November 11, the day Plaintiff completed his FMLA Request Form. Between 4:40 p.m. on November 11, and 8

-8-

a.m. on November 18, Plaintiff was assigned call back duty. On Saturday, November 12, at 8:52 a.m., the on-call supervisor, Ralph Durham, contacted Plaintiff to provide back-up maintenance services to a unit in the General Services-North I maintenance location. Although Plaintiff was the "call back" employee for the General Services-North II maintenance location, the CBA requires the call back employees for General Services-North I and General Services-North II to back each other up. Believing that his issues with A.V. were his "personal business and [Durham] didn't need to know," Plaintiff purposefully kept his conversation with Durham short and did not mention the problems A.V. was having. Plaintiff curtly refused to respond to the "call back," telling Durham only that "[he] did not believe [he] was on call that week." Durham considered Plaintiff's refusal to be in direct violation of the terms of the CBA, and requested a disciplinary hearing.

On November 14, CMHA acknowledged receipt of Plaintiff's FMLA Request. It granted him intermittent FMLA Leave for both periods of time specified in the Healthcare Provider's Certification, but it did not formally do so until December 8 and 9.

### E. FMLA Leave Requests Related to Plaintiff's Own Mental Illness.

During this same period of time, Plaintiff was apparently experiencing some health problems of his own. In 2004, Plaintiff began experiencing paranoia. Apparently, in January 2005, he experienced a panic attack following his meeting with Arnold, Davis and Norton that concerned the dirty garbage can. According to Plaintiff, his panic attack

-9-

culminated from a number of stressors, including having been in a car accident a few weeks before, being required to accept call backs, having his work criticized, and other general work-related pressure.

Plaintiff "start[ed] to get a little out of focus on the edges," and to experience depression. He attributes his depression to having to handle "call backs," the disciplinary charges resulting from his failure to respond to "call backs" in March of 2005, and the growing pressures of his family life. In addition, in May 2005, Plaintiff was involved in a drive-by shooting, which he claims caused him to develop tunnel vision, hallucinations and the shakes.

By November 2005, Plaintiff was experiencing problems with concentration, loss of concept of time, shakes, severe shakes, sleeplessness, [and] nightmares. Although he was experiencing these symptoms, Plaintiff continued to work, except when he needed time off in connection with A.V.'s treatment.

Plaintiff sought no treatment for his own symptoms until November 29, 2005, when he saw his primary care doctor, Dr. Joseph Seibert. According to Dr. Seibert, Plaintiff described stress related to the "call back" requirement; discussed A.V.'s drug issues; said he had anger management issues that "began 2 years ago when he was forced to take call [backs] at work when his wife was on her deathbed"; and requested two months off work because he was afraid he would do something he regretted. Dr. Seibert prescribed medication for Plaintiff and referred him to a psychiatrist, Dr. Kode Murthy.

It was not until Plaintiff's period of treatment with Dr. Seibert that CMHA first learned the extent of the problems Plaintiff was experiencing with A.V.'s health condition and with his own. Specifically, it was during that time frame, on November 14, 2005, that CMHA received Plaintiff's FMLA Request related to A.V.'s treatment for drug addiction.

A few days later, on November 23, 2005, Plaintiff attended a Step III Grievance Hearing related to his disciplinary charges for refusing "call backs" the previous March. At the hearing, Plaintiff provided evidence in mitigation of his conduct, including a note from A.V.'s school describing A.V. as "emotionally disturbed." Plaintiff also told CMHA, for the first time, that he himself was under the care of a physician who prescribed medication for anxiety and depression for him.

The first medical documentation Plaintiff provided CMHA to suggesting that any absence from work was for a serious health condition of his own was a note from Dr. Seibert that said: "Charles Vainisi has been under my care from 11/29/05 and is able to return to work on 12/2/05." On December 1, Plaintiff provided CMHA with another note, indicating that Dr. Seibert was treating him for "medical issues" and that he needed to be off of work until December 13.

In the interim, Plaintiff initiated care with Dr. Murthy. On December 12, Dr. Murthy wrote that Plaintiff should "be off work for two months for treatment of his emotional condition, dysthymia." CMHA deemed Dr. Murthy s instruction to be an

application for FMLA Leave. On December 21, 2005, CMHA granted Plaintiff FMLA Leave for two months beginning on the date of Dr. Murthy's note. Disciplinary action related to Plaintiff's refusal to respond to the November 12 "call back" was postponed indefinitely while Plaintiff was on FMLA Leave.

On January 11, 2006, while out on FMLA Leave, Plaintiff applied to the Ohio Public Employees Retirement System for disability retirement benefits. His application was ultimately granted. Plaintiff never returned to work after Dr. Seibert provided him a work excuse on November 29, 2005. Consequently, no formal disciplinary action related to the November 12 "call back" refusal was ever taken against Plaintiff.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

### A. FMLA Claim

Defendant argues that Plaintiff's FMLA claim, as alleged in the complaint, cannot withstand summary judgment because Defendant timely approved Plaintiff's FMLA requests, Plaintiff was not prejudiced by any delay in approving requests, and Plaintiff was never disciplined for failing to work during a time he was on FMLA leave. In response, Plaintiff fails to address the issues presented by Defendant, and instead argues that Defendant retaliated against him for requesting FMLA leave, an argument Defendant contends was not sufficiently plead. Assuming adequate pleadings, the Court address the merits of the retaliation claim.

Absent direct evidence of retaliation, "the court must apply the tripartite burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Gembus v. MetroHealth System*, 290 Fed. Appx. 842. "In order to make out a prima facie case, a plaintiff must show that (1) [he or] she engaged in protected activity, (2) [he or] she suffered an adverse employment action, and (3) a causal connection existed between the adverse employment action and the protected activity." *Id.* The burden of establishing a

-13-

*prima facie* case of retaliation is easily met. *EEOC v. Avery Dennison Co.*, 104 F.3d 858, 861 (6th Cir. 1997).

"Once a *prima facie* case is established, the burden of producing some non-discriminatory reason falls upon the defendant." *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004)(citing *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997)). "If the defendant demonstrates such, the plaintiff then assumes the burden of showing that the reasons given by the defendant were a pretext for retaliation." *Id*.

With regard to causation, the Sixth Circuit has held that "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (2004) (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986)). However, as noted by Defendants, "[t]emporal proximity is usually not enough to show causation." *Cecil v. Louisville Water Co.*, 301 Fed. Appx. 490 (6th Cir. 2008) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-567 (6th Cir.2000); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986)). Nevertheless, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008).

Here, there is no dispute that Plaintiff availed himself of a protected right under FMLA and that CMHA took two actions after Plaintiff made his first request for FMLA leave in July 2005.

However, Defendant, in his memorandum in opposition, addresses only one of those acts as retaliatory. Specifically, an on-call supervisor requested a disciplinary hearing after Plaintiff refused to respond to a "call back" on Saturday, November 12, 2005, just a day after Plaintiff requested FLMA leave on November 11, 2005. The disciplinary hearing was later suspended indefinitely after CMHA discovered Plaintiff was experiencing mental health issues requiring him to take FMLA leave for treatment. Plaintiff was never formally disciplined for his refusal to respond to the November 12 "call back" because Plaintiff never returned to work after November 29, 2005. Despite the lack of formal discipline, Plaintiff contends that the mere request for a disciplinary hearing is an adverse employment action.

Even assuming that the mere request for a disciplinary hearing is an adverse employment action, Defendant argues that Plaintiff cannot establish a causal connection between the alleged adverse action and his request for FMLA leave. Plaintiff, however, asserts that because the request for a disciplinary hearing occurred just days after his November 11 request for FMLA leave, the temporal proximity of the two events establishes a causal connection.

-15-

Even if temporal proximity is sufficient to establish a *prima facie* case of FMLA retaliation, Defendant offers a non-discriminatory reason for requesting a disciplinary hearing, *i.e.,* Plaintiff's refusal to respond to the November 12 "call back" when he was otherwise not on FMLA leave. As a result, Plaintiff must "show that the defendant's stated reason 'is merely a pretext for discrimination.'" *Mickey,* 516 F.3d 516, 526.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey,* 516 F.3d at 526 (citing *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000)). The "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Id.* (citing *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir.2001)).

Plaintiff contends that Defendant's non-discriminatory reason for requesting a disciplinary hearing is merely pretext because Defendant knew he was caring for his ill son. However, Plaintiff testified that, at the time he received the November 12 call from his supervisor to perform the "call back," his son was out of the hospital, and that he never informed his supervisor that he could not respond because of his child's illness. Instead, Plaintiff testified that he refused to respond because "did not believe [he] was on call at that time." Thus, Plaintiff fails to produce any evidence permitting a reasonable

-16-

jury to conclude that the Defendant's initiation of disciplinary proceedings for failing to respond to the November 12 "call back" was merely a pretext for FMLA retaliation.

As a result, summary judgment in favor of Defendant on Plaintiff's FMLA claim is proper as a matter of law.

## B. ADA Claim

Defendant argues that Plaintiff's ADA claim, as alleged in the complaint, cannot withstand summary judgment because Defendant did not endure harassing, threatening and unfavorable conduct because of a disability. In response, Plaintiff does not address the arguments set forth by Plaintiff, and instead argues that Defendant should have known that Plaintiff suffered from a disability and failed to reasonably accommodate Plaintiff by allowing time off work following a "panic attack" suffered on January 27, 2005. Plaintiff argues that instead of accommodating Plaintiff's perceived disability by permitting him time off, Defendant disciplined him.

Under the ADA, employers are required to reasonably accommodate disabled individuals, unless the accommodation imposes an undue hardship. 42 U.S.C. § 12112(b)(5). Failure to reasonably accommodate an employee with a disability is unlawful discrimination under the ADA. *Id.*; *Hoskins v. Oakland County Sheriff's Dep't.*, 227F.3d 719, 724 (6th Cir. 2000).

"In order to establish a prima facie of disability discrimination under the ADA for failure to accommodate, a plaintiff must show that: (1) [he or] she is disabled within the

meaning of the Act; (2) [he or] she is otherwise qualified for the position, with or without reasonable accommodation; (3) [his or] her employer knew or had reason to know about her disability; (4) [he or] she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Myers v. Cuyahoga County, Ohio*, 182 Fed. Appx. 510 (6th Cir. 2006) (citing *DiCarlo*, 358 F.3d at 419).

Defendant suggests that, by arguing a "perceived disability," Plaintiff seeks to invoke the 'regarded as disabled' provision of the ADA, which "'protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities.'" *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2009) (citing *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir.2008)). The regarded-as-disabled provision applies if "(1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities." *Gruener*, 510 F.3d at 664 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1990)).

Here, while Plaintiff had emotional outbursts and was argumentative on multiple occasions at work, there is no evidence that CMHA demonstrated any misperceptions about Plaintiff's "condition." Further, there is no evidence supporting a conclusion that CMHA harbored misperceptions about Plaintiff's ability to engage in major life activities.

-18-

Plaintiff does not point to any evidence of CMHA's beliefs regarding Plaintiff's inability to engage in any "major life activities." On the contrary, the evidence shows that CMHA continually believed that Plaintiff was able to perform his job because CMHA repeatedly asked him to perform "call backs" and also encouraged him to take more responsibility in addressing work orders. As a result, the "regarded as disabled" provision is not applicable in this case.

Moreover, whether or not Defendant had actual knowledge or constructive knowledge of Plaintiff's disability, there is no evidence that Plaintiff specifically requested and was denied any accommodation for his own disability. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (summary judgment on plaintiff's failure to accommodate claim was proper where plaintiff testified that "she never requested any accommodation from defendant").

As a result, Plaintiff simply cannot establish a *prima facie* case of disability discrimination, and entry of summary judgment in favor of Defendant on Plaintiff's ADA claim is proper as a matter of law.

## C. ADEA Claim

To establish a *prima facie* case of age discrimination, Plaintiff must show "that:
(1) he is a member of the protected class, that is, he is at least forty years of age; (2) he
was subjected to an adverse employment action; (3) he was qualified for the position; and
(4) he was treated differently from similarly situated employees outside the protected
class." *Briggs v. Potter*, 463 F.3d 507 (6th Cir. 2006) (quoting *Mitchell v. Vanderbilt
Univ.*, 389 F.3d 177, 181 (6th Cir.2004)).

Defendant maintains that Plaintiff's age discrimination claim fails because he has
failed to prove he was qualified for the job and that he cannot demonstrate that age
motivated CMHA in making any decisions that adversely affected him. Defendant further
asserts that Plaintiff openly concedes that he was not able to perform the job of Senior
Maintenance Worker.

Plaintiff asserts that it is undisputable that he is a member of the protected class,
was qualified for his position, and was subject to an adverse job action motivated by his
age. Plaintiff's memorandum in opposition, however, points to no facts supporting his
contention that any disciplinary action against him was motivated by age. Instead,
Plaintiff relies solely on conclusory allegations in that regard. However, a party opposing
a motion for summary judgment "may not rest upon the mere allegations or denials of his
pleading, but . . . must set forth specific facts showing that there is a genuine issue for
trial." *Anderson*, 477 U.S. at 248 (1986). Here, Plaintiff has failed to evidence such.

As a result, Plaintiff fails to present a *prima facie* case of age discrimination, and summary judgment in favor of Defendant on Plaintiff's ADEA claim is proper as a matter of law.

## V. CONCLUSION

Accordingly, because no genuine issues of material fact exist, and because Defendant is entitled to judgment as a matter of law on the undisputed material facts, Defendant's Motion for Summary Judgment is hereby **GRANTED**.

**IT IS SO ORDERED.**

DATE: 6/12/09

Timothy S. Black
United States Magistrate Judge